82475-01

January 8, 2015

Honorable Sharon Keller
Chief Justice, Court of Criminal Appeals of Texas
P.O. Box 12308
Capitol Station
Austin, TX 78711



RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 12 2015

Abel Acosta, Clerk

RE: WR-82,475-01 and Tr. Ct. No. D-1-DC-13-904021-A
    STATE OF TEXAS v. CHARLES A. MALOUFF, JR.

Dear Judge Keller,

Attached are transcripts from a October 1, 2014, Evidentiary Hearing in Federal Court where my Prosecutor, Holly Taylor, and the DA Investigator Lori Carter, testified, albeit reluctantly, that Taylor was out **functioning as an investigator**, taking pictures, gathering evidence and interviewing witnesses **before** there was any meaningful probable cause. All of this is outlined in my Writ of Habeas Corpus - see WR-82,475-01 and Tr. Ct. No. D-1-DC-13-904021-A, that Judge Karen Sage improperly dismissed.

Face value, what is wrong with the picture of my "investigator" being my prosecutor? Taylor was less than candor with the Tribunal (see Wood Complaint in Court Records), denied me adversarial testing of a material witness, LIED again on the stand in Federal Court, and has shown that the Travis County, DA will go to whatever Unconstitutional level to **convict innocent people** to cover up their misconduct. I have attached a copy of Steven Brand v. Travis County, specifically Rosemary Lehemburg, filed in Federal District Court as further proof of my allegations of a **miscarriage of justice.**

Its very clear I did **not** get a fair trial! Its also clear as long as Payan is my attorney, I'm not getting a fair Appeal! I have to rely on Federal Court proceedings to remove the **tarnished** cloak of **"integrity"** by which the Prosecutor and shortly, Karen Sage hide behind. Just as I am extracting the **truth** from Taylor, Carter, and the rest of their Prosecution Team, I will soon have Sage on the stand to answer to my Bribery allegations, and her throwing my trial. As these transcripts become available I will forward them to you, Judge Rose and FBI Director Comey for the record.

Respectfully,

Charlie Malouff

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

UNITED STATES OF AMERICA,              ) AU:11-CR-00647(1)-LY
                                       )
   Plaintiff,                          )
                                       )
VS.                                    ) AUSTIN, TEXAS
                                       )
CHARLIE MALOUFF,                       )
                                       )
   Defendant.                          ) OCTOBER 1, 2014

***********************************************
TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE ANDREW W. AUSTIN
***********************************************

APPEARANCES:

FOR THE PLAINTIFF:          DANIEL D. GUESS
                            UNITED STATES ATTORNEY'S OFFICE
                            8612 CONGRESS AVENUE, SUITE 1000
                            AUSTIN, TEXAS 78701

FOR THE DEFENDANT:          OSKAR IVAN NISIMBLAT
                            LAW OFFICE OF OSKAR NISIMBLAT, P.C.
                            401 CONGRESS, SUITE 1540
                            AUSTIN, TEXAS 78701

TRANSCRIBER:                ARLINDA RODRIGUEZ, CSR
                            501 WEST 5TH STREET, SUITE 4152
                            AUSTIN, TEXAS 78701
                            (512) 391-8791

Proceedings recorded by electronic sound recording, transcript produced by computer.

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

# EXAMINATION INDEX

TOBY MILLER
    DIRECT BY MR. NISIMBLAT    12
    CROSS BY MR. GUESS    18

LORI CARTER
    DIRECT BY MR. NISIMBLAT    21
    CROSS BY MR. GUESS    43
    REDIRECT BY MR. NISIMBLAT    48

HOLLY TAYLOR
    DIRECT BY MR. NISIMBLAT    53
    CROSS BY MR. GUESS    68
    REDIRECT BY MR. NISIMBLAT    74

DAVID PETERSON
    DIRECT BY MR. NISIMBLAT    79
    CROSS BY MR. GUESS    101
    REDIRECT BY MR. NISIMBLAT    137

that -- that same day, that next day, it may have been a week later, it may have been a month later. I'm not really sure.

Q. Are there any dates on this supplement that would refresh your memory as to when you --

A. There is a date down at the bottom, August the 3rd of 2010. But that date is not reflective of when each supplement is written. In fact, this 8/3 of '10 may have been when we initially received the complaint from Toby Miller. Our supplements in our system is just these long, running supplements. And then I try to put a heading on it whenever you switch to a different witness and that sort of thing. So I can't tell you when this one specifically was written.

Q. Okay. But that -- but the dates in the actual report reflect when the activity occurred?

A. Yes, sir.

Q. So on this one it indicates that on July 15th, you and Prosecutor Holly Taylor went out to investigate; is that correct?

        MR. GUESS: I'm going to object to the relevance. I don't understand why we're going into what happened in July of 2011.

        MR. NISIMBLAT: Well, Your Honor, this is one of those things where I'm trying to establish this information may have been useful in a defense for Mr. Malouff, in that the prosecutor was actually the investigator, which is -- can be

argued as improper.

THE COURT: The state prosecutor --

MR. NISIMBLAT: Yes, sir.

THE COURT: -- was investigating?

MR. NISIMBLAT: Right. As far as challenging the search warrant, because the search warrant because what --

THE COURT: The federal warrant -- the warrant that led to the federal charges?

MR. NISIMBLAT: Correct.

MR. GUESS: Again, that was a state warrant. We're beyond the scope of the 2255, and we're starting to talk about these particular issues, Your Honor. And that was my concern in terms of, you know, why we needed to keep focused on the ineffective assistance of Mr. Peterson. I believe this is far afield, and I would object as to relevance.

THE COURT: And as I said earlier, I'm going to give you some latitude. But ...

MR. NISIMBLAT: Your Honor, just in response, chart -- count 1 comes from a state warrant.

THE COURT: I understand.

MR. NISIMBLAT: And so Peterson -- there's no record of him ever challenging that state warrant either, we think, because he just didn't have --

THE COURT: When you say "challenging," are we talking about the -- the -- I mean, it was a 4 1/2 hour

MR. NISIMBLAT: Your Honor, I disagree with that characterization. I think that's attacking not the warrant itself and how it was created and whether there was misleading or misrepresenting statements in there but, rather, the execution of it and what occurred during it.

THE COURT: All right. I'll overrule the objection, but just keep it moving.

MR. NISIMBLAT: Yes, Your Honor.

Q. (BY MR. NISIMBLAT) So -- Ms. Carter, so this supplement indicates that you and Holly Taylor, the state prosecutor, went out to Jonestown, took pictures, took videos, and were basically both investigating this -- the complaint?

A. 'I don't know that you could say that we were both investigating. It's common in our office for the prosecutor to want to go out and look at, for example, a homicide scene or where maybe like a sexual assault occurred just to get a good layout of where the crime occurred. For us we had never seen one of these -- well, I'm not sure if I had up to that point. But, at any rate, Holly Taylor had not seen one of these turbans up close, and she thought it would be good, I'm assuming, for her to lay eyes on one of these turbines. Our intention was not to go out and interview anybody that day, just simply to go out and try to figure out where these turbans were.

Q. And is it common for the prosecutors to go out before

charges are filed?

A. I don't know whether or not that's common.

Q. Okay. And so the date, 7/15/2011, is that before you obtained the search warrant that we talked about earlier -- the search warrants?

A. Yes.

MR. NISIMBLAT: Okay. Your Honor, I'd like to admit what I've marked as Exhibit 2.

THE COURT: Any objection to Defendant's 2.

MR. GUESS: No objections, Your Honor.

THE COURT: Defendant's 2 will be admitted.

Q. (BY MR. NISIMBLAT) Ms. Carter, also in front of you is what I've marked as exhibit -- Defendant's Exhibit 3, Supplement With Search and Arrest Warrants.

A. Yes, sir.

Q. Can you describe this document?

A. This is another supplement it's relevant to the search and arrest on October the 11th.

Q. And this is actually the execution of the warrant on the -- that we talked about earlier, correct?

A. Yes. That one as well as five others.

Q. Correct. And on this one, on the sixth paragraph of this exhibit, does it say that you gave Charlie Malouff his Miranda rights?

A. Yes, sir.

A.    Yes, sir.

Q.    And on page 2, fourth paragraph, second sentence?

A.    Yes, sir.

Q.    It stays that "ADA Taylor exited the vehicle and took a picture of fish heads hanging from a fence post." Is that correct?

A.    Yes, sir.

Q.    So she was actively taking pictures during this trip?

A.    She found the fish heads to be interesting. She's a city girl, and I guess she'd never seen that before. But it had no relevance to the investigation.

Q.    But it made it into the investigative notes?

A.    Yes, sir. Because I wanted to be able to explain why those appeared on the same set of photos.

Q.    And do you recall ADA Taylor taking pictures of a power meter?

A.    Yes, sir. I believe so.

Q.    So she was investigating?

A.    We had taken out with us this ridiculous camera that our office has that's -- I have no idea how old --

       MR. NISIMBLAT: Your Honor, objection. Nonresponsive. It's a question of whether ADA Taylor took active part in taking the pictures. I think it's a yes or no. She might have answered it but, if we can have the answer.

A.    I believe maybe she did.

Q.   Do you recall Ms. Holly Taylor on this day of your supplement taking pictures with whatever photographic device you had that day?

A.   I believe maybe she did.  If I'm not mistaken, I think we may have had to use her camera because the equipment that we took out there, it wasn't conducive.  Mr. Malouff and another individual, we had seen him coming down the road, and we had to take the picture quickly and didn't want to be seen with this large, ridiculous camera sticking out.

Q.   So Ms. Taylor took the picture?

A.   I believe she did maybe take one or two at the turbine that's near the wastewater treatment plant.

Q.   Okay.  And just to -- again, this was before the judge had signed the probable cause affidavit, before charges were filed?

A.   Yes, sir.

          MR. NISIMBLAT:  Pass the witness.

          MR. GUESS:  Nothing else, Your Honor.

          THE COURT:  Ms. Carter, you may step down.  May this witness be excused?

          MR. GUESS:  Yes, Your Honor.

          THE COURT:  Mr. Nisimblat, any further need for this witness?

          MR. NISIMBLAT:  I just have one last question.

          THE COURT:  All right.

          MR. NISIMBLAT:  Sorry, Your Honor.

Q.    (BY MR. NISIMBLAT) And I apologize.  Just one last question.  Did you ever ask Toby Miller if he read the grant application?

A.    Yes, I did.

Q.    Okay.  And what was his response?

A.    He said that he had never seen the application.

Q.    Okay.

MR. NISIMBLAT:  No more questions.

THE COURT:  Anything further?

MR. GUESS:  No, Your Honor.

THE COURT:  And may this witness be excused.

MR. NISIMBLAT:  This witness may be excused.

THE COURT:  Thank you.  You may be excused, then.

You want to call your next witness?

MR. NISIMBLAT:  Ms. Holly Taylor.

THE COURT:  If you could raise your right hand to be sworn, please.

(Witness sworn)

                        HOLLY TAYLOR,

having been first duly sworn, testified as follows:

                   DIRECT EXAMINATION

BY MR. NISIMBLAT:

Q.    Would you please state your full name for the record.

A.    Holly Eileen Taylor.

Q.    And where are you employed?

A.    So most of the investigation was done within our office. And we do have law enforcement investigators such as Sergeant Carter on our staff.  Also we have financial analysts.

Q.    So was Sergeant Carter the investigator assigned to Mr. Malouff's case?

A.    Yes.

Q.    And what is your role as the prosecutor during the investigation before charges are filed?

A.    I would say it's supervisory oversight.  I mean, there's some meetings, like if witness interviews are held, the prosecutor is also present.

Q.    Do you go out and fact find?

A.    Sometimes we might accompany an investigator on some fact finding, but not all the time.  But just occasionally.  Such as, I guess, prosecutors also will visit the scene of a murder sometimes.  So there is some -- sometimes we will accompany them to just oversee, I guess, but not always.

Q.    Okay.  And in this case did you -- do you recall accompanying Lori Carter during her investigation?

A.    Not all the time.  I did accompany her on a trip to Jonestown at one point just to view the wind turbines which were still standing at that point, and I also did sit in on witness interviews.  Absolutely.

Q.    And did you -- while you were with her in Jonestown looking at the wind turbines, did you assist in videoing and

taking pictures?

A.    We took some pictures while we were out there, yes.

Q.    And when you say "we," I'm specifically talking about you. Did you take any pictures?

A.    I may have taken a few pictures.  I don't recall specifically.

Q.    Okay.  And were those pictures -- do you know if they were used against Mr. Malouff in his trial?

A.    Not that I know of.

Q.    Okay.

A.    But I just don't recall.

Q.    Okay.  Did you ever go onto CM Energy's property at any time during this investigation?

A.    I don't believe so, no.

Q.    Did you ever talk to the federal public defender about your role in taking a couple of pictures during your trip out to Jonestown?

A.    You know, I really can't -- can't remember that far back in terms of what all we discussed.

Q.    Okay.  Have you -- have you talked to the federal public defender about this case --

A.    Yeah.

Q.    -- about this case?

A.    Well, he came to our office, and he interviewed one of my -- at least one of my investigators.  I think he interviewed

Q.   Right.

A.   -- Agent Wilson specifically because we thought they were relevant to the federal case.

Q.   I guess what I'm getting at is, did you read where Sergeant Carter read Mr. Malouff his Miranda rights, he invoked his rights, but then they came back to him and asked him for information?

A.   Yes.

Q.   Did that concern you, that she might have violated his Miranda rights?

A.   Well, I thought there might be an issue there.  I certainly think there were -- I didn't think it amounted to integration.  Now we're talking about law, so that's a different issue.  Do I think that supplement is relevant?  We provided it, yes.

Q.   Okay.

A.   I certainly thought it was something they would want to look at.

Q.   And as a supervisor role, did you read the search warrant affidavit before it was presented to the magistrate?

A.   Yes.

Q.   And did it concern -- did you know about the concerns about the complainant Toby Miller?

A.   What concerns?

Q.   That he was a disgruntled employee; that he had been

A.    I'm sorry.  I'll let you finish.

Q.    Did that give you any concerns?

A.    That was just him laying out -- that was just her laying out his initial complaint.  As you may recall, I believe these affidavits were 22 pages, single-spaced.  So, I mean, she just laid out his initial complaint, and then she talked about the additional investigation and interviews that she did.

Q.    Yeah.  I know you said it was 22 pages, but a lot of it is just kind of background and the actual charges.

So -- but did anybody from the Federal Public Defender's Office discuss those concerns as far as your office's concern -- initial concern with Mr. Miller and why those weren't in the search warrant affidavit to disclose to the judge?

A.    Well, I don't -- I think that was all part of the search warrant affidavit.  It says in there something about his -- I can't remember how it's phrased, and I don't have the affidavit in front of me.  But it talks about him separating from CM Energies.

Q.    Yeah.  But what I'm saying --

A.    It's in the affidavit.

Q.    My question was:  Did you recall talking to Mr. Peterson or anybody from his office about that concern?

A.    About that concern?  I mean, he was provided with the search warrant affidavits.  I mean, I believe he was.  We

A.    Yes.  I reviewed it, yes.

Q.    Were there any facts in there that you knew to be false, fraudulent, or misleading in any way?

A.    No.  Certainly not.

Q.    Would you have ever submitted a document that contained false, fraudulent, or misleading facts to a court of law?

A.    No.  Of course not.

Q.    If you had any concerns regarding any facts, statements, anything in a search warrant, would you review that with the agent prior to allowing her to submit it to a court of law?

A.    Yes.  And, in fact, I actually asked our financial analyst Robin Timmons to review the affidavit herself before it was presented to the magistrate.  So in addition to me looking over it and trying to find anything that I found to be false, inaccurate, or misleading and not finding anything, I also asked Robin Timmons, a senior financial analyst in the office, who had been looking over the bank records in the case, or at least what we had received so far, to make sure that she felt that everything in there was accurate.  And she -- she approved it before Sergeant Carter took it to the magistrate, yeah.

Q.    And this all took place somewhat before the execution of the warrant in October of 2011?

A.    Yes.  And I don't remember exactly what day prior to that.

Q.    Have you ever attempted to hide or step back from any information contained in that affidavit that you submitted or

April. He received discovery on the 30th of April.

Q. That's good enough? I think the judge has an understanding then.

So let me ask you: In terms of your dealings with Mr. Wannamaker, did you understand him to be working in conjunction with Mr. Peterson at any point or were they totally separate to your knowledge?

A. I don't know. I think I was under the impression that they had communicated, but I don't recall specifically how I -- how I knew that.

MR. GUESS: May I have a moment, Your Honor?

No further questions.

THE COURT: Anything else, Mr. Nisimblat.

MR. NISIMBLAT: Yes, Your Honor. Real quick.

**REDIRECT EXAMINATION**

BY MR. NISIMBLAT:

Q. Do you recall at the state hearing that Ms. Robin Timmons testified that, as early as July, she had relayed to you or to your office that she had not found any evidence of crime?

A. No. I -- I don't -- I saw that. I glanced through some of the filings in federal court and I saw that assertion. I don't remember Robin saying that.

Q. Okay.

A. That -- that doesn't sound consistent. I mean, she reviewed Sergeant Carter's affidavit prior to the search being

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
Austin Division

|  |  |  |
|---|---|---|
| STEVEN BRAND | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:14-CV-00658-__ |
| | ) | |
| v. | ) | |
| | ) | |
| TRAVIS COUNTY, TEXAS | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Steven Brand ("Brand") files this Original Complaint against Travis County, Texas. Brand respectfully shows the Court the following:

### I. Parties

1.     **Parties:** Plaintiff Steven Brand is an individual resident of Texas.

2.     Defendant Travis County is an agency of the State of Texas and may be served with process pursuant to the TEXAS CIVIL PRACTICE & REMEDIES CODE §17.024(a) through the County Judge Samuel Biscoe at 700 Lavaca Street, Suite 2700, Austin, Texas 78701.

### II. Jurisdiction & Venue

3.     **Subject Matter Jurisdiction** -- This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the Constitution, laws, or treaties of the United States, including 42 U.S.C. Section 1983 and the First Amendment to the United States Constitution. This Court also has jurisdiction over the state law claim under the Texas Whistleblower Act pursuant to 28 U.S.C. §1367 because that claim is so related to the claims in

1

the action within the Court's original jurisdiction that they form part of the same case or controversy.

4. Venue is also proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(3) because a substantial part of the events and omissions giving rise to this case occurred in this district. Brand worked for the DA's Office in Travis County, Texas. Brand's actions to cooperate with the Austin Police Department's internal affairs and special investigations units occurred in Travis County, Texas. Brand's cooperation with the Texas Rangers in their investigation of Rosemary Lehmberg occurred in Travis County, Texas. Rosemary Lehmberg's efforts to influence Brand's and another assistant district attorney's testimony to the Austin Police Department occurred in Travis County, Texas. Rosemary Lehmberg's decision to terminate Brand's employment occurred in Travis County, Texas.

### III. Facts

**Steve Brand's Outstanding Career as a Prosecutor**

5. After a distinguished tenure as a Captain in the U.S. Air Force as an Assistant Staff Judge Advocate, and later defending clients in his own private practice, Steve Brand was hired by then Travis County District Attorney Ronnie Earle in 2006 as an assistant district attorney. Brand distinguished himself in the Travis County DA's office as an ethical and capable prosecutor. He has been consistently praised by his superiors for his outstanding legal work. Brand's performance reviews have been impeccable. Brand came to be known in the legal community as an aggressive prosecutor with a strong ethical compass.

6. Rosemary Lehmberg entrusted Brand with some of the most high profile cases in the Travis County DA's office. For example, Brand was selected by Rosemary Lehmberg to be one of four prosecutors in the 2010 prosecution of Tom DeLay. Brand successfully prosecuted

2

non-capital and capital murder cases and was part of a team of two prosecutors re-investigating an officer-involved shooting. Rosemary Lehmberg assigned Brand to speak to groups on her behalf, including once to a select student group on the floor of the State Capitol, and once to a delegation from the Mexican judiciary.

7.     Around December 2009, after a unanimous vote of approval by her executive committee, Rosemary Lehmberg promoted Brand to the position of Chief Assistant District Attorney in the 390th District Court, a post in which he became responsible for other attorneys prosecuting cases in the 390th District Court. Rosemary Lehmberg often referred to Brand as her "favorite court chief."

**The First Darius Lovings Trial:  Steve Brand Refuses to Allow an Austin Police Detective to Present False Testimony**

8.     In June, 2012, Darius Lovings flagged down a passing motorist, William Ervin, a father and employee of the Texas Department of Public Safety. When Ervin pulled over, Lovings murdered him. Ervin's body was found on the roadside. Steve Brand and Monica Flores were assigned by the Travis County DA's office to prosecute Lovings for Mr. Ervin's murder.

9.     The night of the murder, the Austin Police Department's second ranking detective on the case was Detective Anthony Nelson. As the second ranking detective on the case, Nelson was responsible for, among other things, securing the crime scene.

10.     The trial of Darius Lovings was scheduled for the last week of January 2014. In preparation for the trial, Steve Brand and Monica Flores met with Detective Nelson on or about January 10, 2014. During the meeting, Nelson told Brand and Flores words to the effect of, "Just between us, I felt like I lost control of the crime scene that night."

3

11.     This was the first Steve Brand and Monica Flores had heard of Nelson having "lost control of the crime scene." Nelson had not stated in any of his written reports that he had lost control of the crime scene. The detective in charge of the investigation had not indicated in his report that Nelson had informed him that Nelson had lost control of the crime scene.

12.     Brand immediately informed Nelson that he could not "keep this just between us." Brand briefly explained the *Brady* rule, which, as a matter of constitutional due process requires a prosecutor to provide the defense with certain evidence favorable to the accused.

13.     After the meeting with Detective Nelson, Brand exercised his constitutional duty and contacted Jon Evans, the lawyer for Darius Lovings. Brand told Evans that Nelson had said words to the effect of, "Just between us, I felt like I lost control of the crime scene that night."

14.     Approximately two weeks later, Detective Nelson was testifying at Darius Lovings' trial. Under cross examination, Detective Nelson admitted that he had "lost control of the crime scene." But, on re-cross examination, Detective Nelson specifically denied having asked Brand to keep that admission "between us."

15.     Brand knew that Nelson was not testifying truthfully. Brand conferred with Monica Flores to check his own memory and to be sure she remembered what Detective Nelson had said in the interview. Flores confirmed that she too distinctly remembered Nelson asking the prosecutors to keep this "between us."

16.     Brand then asked for a recess so that he could exercise his duty as a lawyer and officer of the court to prevent a witness from giving false testimony. Presiding Judge Julie Kocurek conferenced with the attorneys at the bench. During that conference, Brand informed Judge Kocurek that Detective Nelson had not testified truthfully and described the interview of Detective Nelson that occurred on January 10. At some point, another prosecutor also reminded

Brand of something that occurred in a recent case in which Detective Nelson also gave incorrect testimony while under oath. Brand again exercised his ethical duty and informed Jon Evans (Lovings' defense attorney) of Detective Nelson's prior inaccurate testimony.

17.    Judge Kocurek, Lovings' counsel, and Steve Brand ultimately agreed that a stipulation would be read to the jury stating that Detective Nelson's testimony in regard to the fact that this was "just between us" was not accurate. Steve Brand had properly exercised his ethical duty.

18.    The trial continued, and Steve Brand and Monica Flores were instrumental in securing a conviction of Darius Lovings for the murder of William Ervin. Lovings was sentenced to 75 years in prison.

**Rosemary Lehmberg Tries to Influence Brand's Testimony During an APD Investigation**

19.    Having learned of Detective Nelson's testimony and the stipulation that that his testimony was not accurate, the Austin Police Department initiated two separate investigations into Detective Nelson's testimony. One investigation was being conducted by APD's internal affairs unit ("Internal Affairs"), which is responsible for investigating violations of police department policy. A separate investigation was being conducted by APD's special investigations unit ("SIU"), which is responsible for investigating possible criminal violations by police officers.

20.    Around mid-February 2014, an investigator from Internal Affairs and a separate investigator from SIU contacted Brand to schedule an interview. Brand agreed to speak with APD's investigators and notified his supervisor that he had been contacted by the two APD units.

21.    Brand's supervisor suggested that Brand speak with Rosemary Lehmberg before speaking with APD.

22.     Brand went to Lehmberg's office sometime in February 2014 to discuss the fact that he intended to speak with APD investigators about Detective Nelson's testimony in the Lovings case. At the start of the meeting Lehmberg got up from behind her desk and closed her office door. After a brief discussion of the situation, it was clear to Brand that Lehmberg was already aware of what had occurred during the Lovings trial and was aware that APD was investigating Detective Nelson's inaccurate testimony.

23.     Lehmberg told Brand that she believed the situation had been "blown out of proportion" and insisted to Brand that "you are the only one who can fix this." Lehmberg said she did not believe Detective Nelson should be relegated to desk duty and told Brand that he could just attribute the situation to the heat of battle in trial. She repeated again, "You are the only one who can fix this."

24.     Brand told Lehmberg that he did not know what he could do to "fix this," and that he intended to simply tell the truth about what Nelson said in the interview and the contradictory testimony he gave during the trial itself. Lehmberg responded to the effect that Brand should "go beyond the facts" and should tell investigators that he believed the whole thing had gotten blown way out of proportion. Brand was confused and taken aback by Lehmberg's tone and demeanor, saying words to the effect of, "that is not how we treat defendants who lie." Lehmberg responded that Detective Nelson was not a defendant and that the situation was different.

25.     Brand left the meeting troubled by Lehmberg's attempt to urge Brand to say something to APD Internal Affairs and SIU that he did not believe. Brand did not believe the matter had been blown out of proportion. A police detective had given false testimony in a murder trial. That same detective had failed to note in his report or share with the lead detective

6

that he, the officer in charge of the crime scene, had lost control of the crime scene. Brand knew that this fact was the very fact that the detective had asked Brand to "keep just between us." Brand was also reminded during the Lovings trial by another assistant district attorney that Detective Nelson had also given false testimony in a different proceeding in 2013. And finally, Brand found it completely inappropriate to "go beyond the facts" as Lehmberg was urging him to do. Brand did not intend to proceed according to Lehmberg's values. Instead Brand intended to tell the truth.

26.     For reasons unknown to Brand, his interview with Austin PD Internal Affairs and SIU was delayed by a week or two. On information and belief, Rosemary Lehmberg or John Neal, Lehmberg's first assistant DA, requested the delay in Brand's interview. By around the last week of February, 2014, Brand had still not been interviewed by APD and was in trial in the case of *State v. Jeron Neal.* During the trial, Brand received an email from Rosemary Lehmberg asking to meet with Brand later in the week. The other assistant district attorney on the Darius Lovings case, Monica Flores, also received a similar email. Brand and Flores met with Lehmberg in Lehmberg's office on or about February 28, 2014. John Neal, Lehmberg's first assistant DA, also joined the meeting.

27.     Lehmberg began the meeting by expressing her concern about the fallout from Brand's handling of Detective Nelson's testimony in the Lovings trial. Lehmberg said that the issue "troubled" her and had caused a rift between the DA's office and APD. At one point Lehmberg said in a frustrated tone, "For God sakes, there's a homicide detective on desk duty."

28.     Lehmberg also stated that the matter caused her to be concerned about Brand's reputation, Flores's reputation, and Detective Nelson's reputation.

7

29. Lehmberg asked Brand what he intended to say when he was interviewed by APD. Brand replied that he intended to tell the truth.

30. Lehmberg was dismissive of Brand's response and replied to the effect that, "if all they wanted was the truth, they could go off the transcript, which they already have." Lehmberg asked Brand and Flores, "Do you think Nelson meant to lie?" Brand answered that he did not know definitively but that he intended to tell APD investigators what happened.

31. Brand was not contending that Detective Nelson intentionally lied. Brand acknowledges that witnesses sometimes give inaccurate testimony because of faulty memory or other reasons. But Brand was not willing to falsely state to APD investigators that he believed Nelson had simply made an honest mistake. Brand also raised with Lehmberg the fact that Detective Nelson had given inaccurate testimony in a previous case, which had to be considered in assessing whether Nelson's untruthful testimony in the Lovings case was unintentional.

32. When Brand told Lehmberg that he and Ms. Flores had informed Lovings' attorney about the prior testimony by Detective Nelson, Lehmberg said, "Huh. That's interesting."

33. Lehmberg persisted in her attempt to influence what Brand would say to APD investigators, repeating several times to Brand and Flores that "you are the only ones who can fix this." Brand told Lehmberg that he realized there are sometimes repercussions for doing the right thing. Lehmberg did not take that statement well. She became visibly frustrated and told Brand that several people had told Brand time and again ways he could have handled the situation differently.

34. Unable to influence Brand to mislead the APD investigators and to "fix" the "rift" that Detective Nelson's testimony and Brand's proper response to it had allegedly caused,

Lehmberg then changed tactics. Lehmberg looked at Brand and said words to the effect of, "I think a lot of you. I made you a court chief." Brand detected a threatening tone and implication – that Lehmberg could also un-make Brand a court chief. After a pregnant pause, Lehmberg added, "Oh, and I still do [think highly of you]." Lehmberg then turned to Monica Flores and said she thought highly of Flores too. Lehmberg then addressed them both by repeating, "You are the only ones who can fix this."

35.     Lehmberg added that she was not going to tell Brand and Flores what to do but that he and Ms. Flores should think long and hard about what they say to the police. The entirety of the meeting and Lehmberg's words and actions demonstrated without a doubt that she was asking Flores and Brand to tell APD investigators that Nelson had not deliberately lied and that the matter had been blown out of proportion.

**Brand Speaks with APD, Refuses to Provide False or Misleading Information**

36.     Sometime in March, 2014 Brand met with Detectives Bircher and Griffin from the APD SIU and a Sergeant in Internal Affairs about Detective Nelson's testimony in the first Darius Lovings trial. Brand answered their questions truthfully. Brand did not, as Lehmberg had suggested, say that the matter had been blown out of proportion or assert that Detective Nelson had not intentionally lied. Brand explained the facts unequivocally: that Detective Nelson had testified untruthfully.

**Brand Informs APD of Lehmberg's Attempt to Influence His Testimony**

37.     During the interview with APD SIU and Internal Affairs, Brand described the conversation between Brand, Monica Flores and Rosemary Lehmberg on February 28, 2014 and Brand's earlier conversation with Lehmberg. Brand explained that he felt pressured by Lehmberg to provide information to the APD that minimized the seriousness of the situation and

that was not true -- that he believed Nelson had not intentionally lied and that the matter had been blown out of proportion. The APD officers seemed concerned by what Brand described. After hearing Brand's account of the two conversations with Lehmberg, the three officers stepped outside to talk privately. After they returned to the room, one of the officers informed Brand that they thought the best course of action was to notify the Texas Attorney General's office about Brand's conversations with Lehmberg. The officers indicated that Lehmberg's actions as described by Brand were of sufficient concern that the matter should be investigated. But, they said, APD would not be the appropriate law enforcement agency to investigate whether Lehmberg's conduct was illegal.

**The Texas Rangers Investigate Lehmberg; Brand Cooperates**

38.     In early April 2014, Brand was contacted by Officer James Jones of the Texas Rangers. Officer Jones asked Brand to come to his office to be interviewed about his conversations with Lehmberg leading up to Brand's interview with APD Internal Affairs and SIU. Brand cooperated fully in the Texas Rangers' investigation. In particular, Brand reported the facts of his meetings with Lehmberg and the coercive nature of the meetings.

**Lehmberg Labels Brand a "Whistleblower"**

39.     In late April or early May 2014, Brand was approached by his direct supervisor. His supervisor told Brand in reference to Lehmberg and in reference to Brand's cooperation with the Texas Rangers, "She knows." Brand's supervisor said he had been informed that Brand was to be "treated as a whistleblower." Brand's supervisor said that Lehmberg had said words to the effect of, "He [Brand] knew exactly what he was doing."

**Lehmberg Fires Brand Under Pretext of Enforcing Lehmberg's Own "Values" and the Public's Confidence in the DA's Office**

40.    In late May 2014, Brand was prosecuting Darius Lovings again, this time for the aggravated robbery of Elizabeth Pantoja.  The aggravated robbery occurred approximately 23 hours after Lovings murdered William Ervin.

41.    During jury selection, Lovings' lawyer asserted that Brand had used one of the state's 10 peremptory strikes in violation of the *Batson* rule, a constitutional principle that prohibits lawyers from using peremptory strikes because of a potential juror's race.  The magistrate judge who had presided over the entire jury selection denied Lovings' lawyer's motion.

42.    However, the next day, just before the trial was about to begin, Lovings' lawyer re-urged his *Batson* motion before Judge Julie Kocurek.

43.    Judge Kocurek knew that the Lovings cases were high profile and important to the public.  They involved a highly publicized murder of a good Samaritan during a crime spree in which others were assaulted.  The prior conviction of Lovings for murder was also on appeal at the time.  To avoid any doubt and to remove Lovings' *Batson* challenge as a ground for further appeal, Judge Kocurek granted Lovings' motion and scheduled a new jury selection for two weeks later.

44.    Judge Kocurek later told Brand that she knew Brand did not intend anything by his actions.  Judge Kocurek also later told Brand that, had Brand been afforded a "full blown hearing" to respond to Lovings' *Batson* challenge she "might have ruled differently."

45.    On the morning of June 4, 2014, three days after the second Darius Lovings trial concluded with a guilty plea and a 20-year sentence, Lehmberg called Brand into her office and told Brand she was going to demote Brand.  Lehmberg said that Brand's response to the *Batson*

challenge was "so racially insensitive" and "so against everything I stand for." Lehmberg told Brand he could not be trusted with leadership and that he would be moved to the Grand Jury division. Lehmberg stated she was not firing Brand and stated, "If I really thought you were a racist, I would have fired you," or words to that effect. She also stated that, "believe me, I know about getting second-chances," or words to that effect. She also told Brand that he should probably keep the work-intensive and high-profile case of the *State of Texas v. Gene Vela*.

46. Just after the lunch hour that same day, Lehmberg called Brand into her office again. Lehmberg said she had thought about the matter over lunch. Lehmberg told Brand, "I made you a court chief, and you have not been grateful. I don't think I'm going to keep you." Lehmberg said she was going to think about it and put Brand on leave.

47. The following Monday, June 9, 2014, Lehmberg texted Brand asking for a meeting the following day. After some preliminary discussion, Lehmberg told Brand, "I've thought about it. There's no way I can see you carrying on as an attorney in this office." Lehmberg told Brand he would be given the option to resign rather than be terminated. When Brand asked what would be the effect of a resignation as opposed to a termination, Lehmberg said it would affect what she would say to the public and his future employers about his departure.

48. Brand refused to resign. He told Lehmberg he had a wife and a child and was three-months away from vesting in his Travis County retirement. Lehmberg fired Brand on or about June 11, 2014 retroactive to June 10, 2014. That same day, Lehmberg launched a campaign to ruin Brand's credibility by falsely painting him as a racist and mischaracterizing his response to the *Batson* challenge in the Lovings case. Lehmberg issued a statement to the media claiming that Brand's statements "did not reflect my opinions or my values or those of our

organization." In reference to Brand, Lehmberg stated that "Travis County citizens need to know that membership in the NAACP does not disqualify you from jury service in our community." These statements were false and defamatory.

**Lehmberg's Stated Reasons for Termination are Pretexts**

49.    Lehmberg has demonstrated that she does not in fact hold the values she asserted as the reason for terminating Brand's employment. Lehmberg's claimed "values" are a mere pretext to conceal her retaliation against Brand for telling the truth to APD and cooperating in the Texas Rangers' investigation into Lehmberg's attempts to influence Brand's testimony.

50.    Lehmberg knew that Steve Brand does not believe and has never stated that membership in the NAACP disqualifies a citizen from jury service. Lehmberg's statement to that effect was a deliberate attempt to distort the truth of Steve Brand's work in the Lovings case and to falsely label Steve Brand as a racist.

51.    Nor does Lehmberg actually adhere to her stated value of respecting organizations with missions similar to that of the NAACP. For example, in 2012, Rosemary Lehmberg was running for reelection in a contested Democratic primary against Charlie Baird. In the early months of 2012, Rosemary Lehmberg's campaign made a curious request of Steve Brand. Brand was approached by a member of Lehmberg's campaign staff who handed Brand an application to join the Black Austin Democrats. The campaign staffer explained that the Black Austin Democrats would soon be voting on which of the two candidates to endorse and that, by joining the Black Austin Democrats, Brand could vote in the Black Austin Democrats endorsement process. The campaign staffer told Brand that, if he joined the Black Austin Democrats, the Lehmberg campaign would reimburse Brand for the cost of the club's dues.

52.     Brand filled out the application per the campaign's request, but then told the campaign not to submit it. Brand, who is white, was disappointed in what he believed was an inappropriate and cynical ploy by Lehmberg to co-opt the endorsement processes of the Black Austin Democrats. Brand felt that it was disrespectful to African-Americans in Austin to recruit white, non-Austinites to join the Black Austin Democrats for the sole purpose of stuffing the ballot box for a Lehmberg endorsement by the organization. Lehmberg had never before suggested that Brand join the Black Austin Democrats. Lehmberg had never before urged Brand to support any initiatives of the Black Austin Democrats. Lehmberg wanted in this case only to manipulate the Black Austin Democrats' endorsement process to win political advantage for herself.

53.     Lehmberg's claim that Brand must be fired to protect the public's confidence in her office is also false and a pretext. For example, in 2010, a Travis County trial court judge ruled that a Travis County prosecutor had unfairly withheld evidence from the defense in a felony aggravated assault case. The court vacated the conviction because of the prosecutor's misconduct. Less than eighteen months earlier, a different court in a different case vacated another sentence because the same prosecutor improperly withheld evidence. Rosemary Lehmberg did not fire that prosecutor for twice withholding evidence and twice causing sentences to be vacated. Lehmberg promoted that prosecutor. If Lehmberg truly valued the public's confidence in the office of Travis County District Attorney, she would have treated that prosecutor the way she treated Brand.

54.     Moreover, as Lehmberg has readily admitted, her own criminal conduct has brought disgrace upon the Travis County District Attorney's office and eroded the public's confidence in her and her office. Yet Lehmberg did not resign. In April 2013, Lehmberg was

arrested for DWI on an Austin street. Lehmberg refused to take a Breathalyzer test. When her blood was tested, Lehmberg's blood alcohol level registered .239, nearly 3 times the legal limit.

55.     While in jail, Lehmberg was seen on video threatening two female officers who were trying to remove Lehmberg's handcuffs, telling them, "You better do something quick 'cause ya'll are going to be in jail, not me." Lehmberg called one of the female officers, "stupid and silly."

56.     Lehmberg repeatedly and loudly insisted that the sheriff's deputies "call Greg!" in reference to Travis County Sheriff Greg Hamilton. Lehmberg refused orders to stop kicking her cell door and had to be placed in an emergency restraint chair. Lehmberg did not resign following the public airing of her conduct, which gives lie to Lehmberg's claim now to be concerned about the community's confidence in the integrity of her office.

## IV. Causes of Action

**Count 1: Section 1983 and First Amendment Claim**

57.     Brand incorporates and re-alleges paragraphs 1- 56 above.

58.     As of the day Brand's employment was terminated by Travis County, it was well established that a governmental employer cannot condition public employment on a basis that infringes an employee's constitutionally protected interest in freedom of expression.

59.     Brand engaged in several forms of speech that are protected under the First Amendment to the United States Constitution and that relate to matters of public concern.

60.     Brand reported to the Austin Police Department that a police officer testified falsely during a trial and reported to the Austin Police Department and reported to the Texas Rangers that Rosemary Lehmberg attempted to influence what Brand would say to the Austin Police Department. Brand also refused to say to the Austin Police Department what Lehmberg

15

asked Brand to say, which is itself a form of protected speech.

61. As of the day Brand's employment was terminated, it was well established that speech which discloses evidence of corruption, impropriety, or other malfeasance on the part of government officials concerns a matter of public import.

62. Travis County terminated Brand's employment in whole or in part because of the activity described above, which activity is protected by the First Amendment. Brand's protected speech was a substantial or motivating reason for termination of Brand's employment in violation of 42 U.S.C. §1983 and the First Amendment.

63. It serves no interest of Travis County to prohibit or discourage an employee from reporting untruthful testimony by a police officer or from reporting an attempt by the district attorney to influence a subordinate's testimony to the police department.

64. The termination of Brand's employment has caused him damages, including but not limited to lost wages, lost benefits, and harm to his reputation.

**Count 2: Texas Whistleblower Act**

65. Brand incorporates and re-alleges paragraphs 1-64 above.

66. As an assistant district attorney, Brand was a public employee.

67. Brand in good faith made a report to various law enforcement authorities that another public employee violated the law. Brand reported to the trial court that a witness had given false testimony during a criminal trial. Brand reported to the Austin Police Department that a witness had given false testimony during a criminal trial. Brand reported to the Austin Police Department that Rosemary Lehmberg had attempted to influence him to make untrue statements to the Austin Police Department. Brand reported to the Texas Rangers that Rosemary

Lehmberg had attempted to influence him to make untrue statements to the Austin Police Department.

68.     Rosemary Lehmberg, who terminated Brand's employment, knew of his good faith reports to law enforcement.

69.     Brand's employment was terminated in whole or in part because of his good faith reports of unlawful conduct to law enforcement.

70.     Brand's reports to the Texas Rangers occurred within ninety (90) days of his termination. Pursuant to TEX. GOV'T CODE §554.004(a), there is a rebuttable presumption that that his termination was caused by his report to the Texas Rangers.

71.     The termination of Brand's employment has caused him damages, including but not limited to past lost wages, past and future lost benefits, loss of future earnings and earning capacity, harm to his reputation, emotional pain, mental anguish, and loss of enjoyment of life.

72.     Brand seeks, among legal and other equitable remedies, reinstatement to his former position or equivalent position and to have lost fringe benefits and seniority rights reinstated, including but not limited to the vesting of his retirement benefits.

73.     Travis County has no grievance procedure that covers Brand's claim for unlawful termination under the Texas Whistleblower Act.

74.     Brand attempted to invoke a grievance procedure by contacting the Travis County Attorney's office on or about June 12, 2014. On June 13, 2014, an attorney in the Travis County Attorney's office informed Brand's counsel that Brand does not have a grievance policy available to him because Brand was employed by an elected official.

75.     Brand has filed this lawsuit within ninety (90) days of the termination of his employment.

17

## V. Jury Demand

76.     Having tendered the appropriate fee, Brand hereby demands a trial by jury.

## VI. Attorneys' Fees

77.     Brand has retained the undersigned attorneys to prosecute this case.  Brand has incurred attorneys' fees that are reasonable and necessary.  Brand asks the Court to award Brand reasonable and necessary attorneys' fees and costs of court.

## VII. Conclusion and Prayer

Brand respectfully requests that he have judgment against Travis County for:

a.      Actual damages;

b.      Punitive damages;

c.      Lost past income and benefits;

d.      Lost future benefits;

e.      Compensation for lost earning capacity;

f.      Injunctive relief ordering that Brand be reinstated;

g.      All costs of expert witnesses and the costs of litigation;

h.      Attorneys' fees for prosecution of this case at trial and on appeal;

i.      Pre-judgment interests as required by Chapter 304, TEXAS FINANCE CODE or other applicable laws;

j.      Post-judgment interest, at the maximum legal rate; and

k.      All other relief to which Brand may be entitled at law, or in equity.

Respectfully submitted,


/s/ Thomas A. Nesbitt
Thomas A. Nesbitt
  State Bar No.  24007738
tnesbitt@dnaustin.com
Scott F. DeShazo
  State Bar No. 24011414
sdeshazo@dnaustin.com
Laura J. Goodson
  State Bar No. 24045959
DeShazo & Nesbitt L.L.P.
809 West Avenue
Austin, Texas  78701
512/617-5560
512/617-5563 (Fax)

**COUNSEL FOR PLAINTIFF**
**STEVEN BRAND**